Ralph E. LEE et al.,
Plaintiffs-Respondents,

v.

ROLLA SPEEDWAY, INCORPORATED,
Defendant-Appellant,

and

Central Missouri Regional Fair,
Incorporated, Defendant.

No. 10012.

Missouri Court of Appeals,
Springfield District.

June 23, 1976.

Motion for Rehearing or to Transfer to Supreme Court Denied July 9, 1976.

Application to Transfer Denied
Sept. 13, 1976.

Melvin E. Carnahan, Rolla, for plaintiffs-respondents.

L. W. Hannah, Yates, Mauck, Robinett & Hannah, Springfield, for defendant-appellant.

Before STONE, P. J., and HOGAN and TITUS, JJ.

TITUS, Judge.

Defendant Central Missouri Regional Fair, Incorporated (Fair), as landlord, and defendant Rolla Speedway, Incorporated (Speedway), as tenant, entered into a lease in October 1968 whereby Speedway obligated itself to construct an automobile racetrack on the leased premises. After Speedway had partially performed clearing and grading work at the proposed track site, an attorney, representing some 45 residents in the vicinity of the track, wrote to Fair and Speedway in May 1969 demanding that construction of the track be halted for the avowed reason that its use would constitute a nuisance. When the demand went unheeded, a petition was filed in July 1969 by 21 residents living within a ⅜ths mile radius of the project to enjoin construction, maintenance and operation of the racetrack.

Upon conclusion of the first trial of the cause in August 1970, the circuit court denied the injunction and plaintiffs appealed to the Supreme Court. That tribunal, recognizing that the racetrack had been completed and had been in operation pending appeal, reversed and remanded the case for further proceedings because, inter alia, "there is no necessity to adjudge 'the extent

of the harm involved' on a theoretical basis. Evidence should now be available as to the actual effect of the track operation and the rights of the parties can much better be adjudged on that basis." *Lee v. Rolla Speedway, Incorporated*, 494 S.W.2d 349, 355[4] (Mo.1973).[1]

Following the second trial, the circuit court prepared and filed a comprehensive memorandum containing extensive findings of facts and concluded: "[I]t is the Order, Judgment and Decree of this court that the defendants . . . and each of them, and their assigns or any person, association, partnership, corporation or entity whatsoever, acting by, through or under defendants, be and they are hereby permanently enjoined and restrained from operating an automobile racetrack or speedway on the lands of defendant Fair." Only defendant Speedway has appealed.

■■■ Speedway's first point relied on is that "On appeal from a cause tried before the trial judge both the evidence and the law applied thereto by the trial judge must be considered." This is a poor start for any appellant's brief because mere abstract statements of what purports to be the law do not comply with the mandatory requirements of Rule 84.04(d), V.A.M.R. [*M & A Electric Power Cooperative v. Nesselrodt*, 509 S.W.2d 468, 470[1] (Mo.App.1974)] and save nothing for appellate review. *Hines v. Sweet*, 518 S.W.2d 710, 711[1] (Mo.App. 1975). Nevertheless, before some unwary reader is misled by the abstraction, we iterate that injunction is distinctly an equitable remedy (*State ex rel. Ellis v. Creech*, 364 Mo. 92, 96, 259 S.W.2d 372, 374[3] (banc 1953); 42 Am.Jur.2d, Injunctions, § 2, at p. 727), and in reviewing court-tried causes, Rule 73.01–3(a), (b), V.A.M.R. constrains us to "review the case upon both the law and the evidence as in suits of an equitable nature" giving due regard "to the opportunity of the trial court to have judged the credibility of witnesses." All of which "is construed to mean that the decree or

judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong. The use of the words *de novo* and *clearly erroneous* is no longer appropriate in appellate review of cases under Rule 73.01." *Murphy v. Carron*, 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976).

Also in abstract fashion, Speedway claims trial court error (1) because the court failed to "consider the nature of the area in which Speedway was located and that the grounds of Regional Fair was the proper location for Speedway"; (2) because the court found "that the area where plaintiffs' [sic] lived was a 'quiet residential area'"; (3) because the court "improperly considered the traffic generated by Speedway's operation as a factor in granting the injunction"; and (4) because the injunction "is too broad in that it curtails the lawful operations of Speedway more than is necessary to protect the rights of plaintiffs."

■■■ The requirements of Rule 84.04(d) that "The points relied on shall state . . . what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous," are applicable to appellate review of court-tried cases. *Boyd v. Boyd*, 459 S.W.2d 8, 12[9] (Mo.App.1970). Merely asserting what the alleged errors are without stating "wherein and why" they are errors neither states the rule nor preserves anything for appellate consideration. *Chambers v. Kansas City*, 446 S.W.2d 833, 841[14] (Mo.1969). An appellate court has no obligation to seek the meaning of points relied on which amount to nothing more than abstract assertions by searching the transcript or seining the ar-

---

1. The first races were held at the track on July 3, 1971. By the time of the second trial in December 1974, the track had been used and operated during the 1971, 1972, 1973 and 1974 racing seasons.

gument portion of an appellant's brief. *Dors v. Wulff*, 522 S.W.2d 325, 327[5] (Mo. App.1975); *In re Estate of Barks*, 488 S.W.2d 928, 930[5] (Mo.App.1972). From a reading of the "points" just noted, if the trial court did indeed fail to consider the nature of the involved area or that the fairgrounds was a proper place for the track, we are left to ponder "why" such averred failure constituted error. "Why" it was error to conclude the affected neighborhood was a quiet residential area is consigned to speculation. Likewise, no inkling is provided as to "wherein and why" appellant contends it was error to consider the traffic generated by Speedway's operation, or "wherein and why" the injunction is allegedly too broad or serves to curtail appellant's operations more than is necessary.

Speedway offers two similar points which we consider together. Although these points tend toward abstraction and are rather obtuse, the gist of them seems to be that because the trial court allegedly failed to consider Speedway's evidence that its operation could be conducted more quietly than shown by plaintiffs' evidence or that it was possible the sound level could be reduced to a tolerable level, the decree nisi "has the effect of enjoining an anticipated act performed in a manner on which plaintiffs adduced no evidence."

Of course, there is no evidence that the trial court failed to consider any evidence produced by Speedway and a statement to that effect appearing in an appellant's brief is no proof of the fact asserted. *Gonseth v. K & K Oil Company*, 439 S.W.2d 18, 25[12] (Mo.App.1969). Also to be considered is that the trial court, as trier of the facts, may simply have declined to believe the testimony adduced by the defendant, which it has a perfect right to do. *Dill v. Poindexter Tile Company*, 451 S.W.2d 365, 371[7] (Mo.App.1970).

Plaintiffs had testimony of a professor of mechanical engineering at the University of Missouri-Rolla whose specialty was in the area of noise control, acoustics and vibrations. The qualifications of that expert are not here challenged by Speedway. As found by the trial court, the witness "had made a study of the area in which some of the plaintiffs resided; that he had used a sound level meter and a high quality recorder to reproduce sounds occuring [sic] at designated points; that such a process would accurately record and preserve the various sounds just as they were heard at the point where they were being recorded. Further that standards had been arrived at for maximum acceptable values in quiet residential areas which measured by decibels on the A scale were:

| "Basic Noise Level | Frequent Peaks | Infrequent Peaks |
|---|---|---|
| Night | 45 | 55 | 65 |
| Day | 55 | 65 | 70 |

That community reaction to noise on the average was as follows:

| | Corrected Noise Rating |
|---|---|
| No observed reaction | less than 40 |
| Sporadic complaints | 40–50 |
| Widespread complaints | 45–55 |
| Threats of community action | 50–60 |
| Vigorous community action | above 65 |

"That speech interference levels should be less than the values given to have reliable conversation at the distances and voice levels shown:

| Distance (feet) | Voice Level normal | raised | very loud | shouting |
|---|---|---|---|---|
| 1 | 70 | 76 | 82 | 88 |
| 3 | 60 | 66 | 72 | 78 |
| 6 | 54 | 60 | 66 | 72 |
| 12 | 48 | 54 | 60 | 66 |

"Dr. Gatley further testified that on May 11 and May 27, 1974, at which time races were being run by Speedway on the track in question recordings at various points were made showing the following results:

| May 11, 1974 | DBA (1) | SIL (2) | CNR (3) |
|---|---|---|---|
| Brady Residence (1100 feet from Track) | 71–84 | 74 | 70–75 |
| Apartments East of track (590 feet from racetrack) | 68–74 | 62 | 65–70 |
| **May 27, 1974** | | | |
| Brady Residence (1100 feet from track) | 63–66 | 59 | 55–60 |
| Lee Residence (700 feet from track) | 80–86 | 77 | 75–80 |
| During yellow flag | 69–72 | 63 | 65–70 |
| Collier Residence (1400 feet from track) | 79–81 | 74 | 75–80 |
| Apartments East of Track (590 feet from track) | 83–87 | 80 | 75–80 |
| Ambient Noise Level (Some track activity) | 52–53 | | |

(1) Sound level, A-weighted decibels. (2) Speech Interference Level.

(3) Composite Noise Rating.

---

"Three one-minute segments of the recorded sound taped on May 11 and May 27, 1974 while races were in progress at the race track were played as evidence during the trial, reproducing the sound at the same levels and intensities as it was heard at the various points at which it was originally recorded. These segments were taken from tapes made 590 feet, 700 feet and 1400 feet from the race track. The witness testified that he had had 10 years' experience in this type of work; that the segments reproduced and played were authentic; that the instruments used were checked for accuracy and that the reproduction used in court accurately represented the sound as heard at the various points it was originally recorded."

■ Speedway's evidence that its operations could be conducted more quietly than shown by plaintiffs' evidence, was predicated on a theoretical restriction by Speedway on the size of vehicles and the requirement that all racing cars be equipped with mufflers. Speedway's principal witness on the subject was a manufacturer of mufflers and other race car components. In fine, his testimony was that in testing a given race car at 50 feet with a "decibel meter," the use of a muffler would reduce motor noise from 103 to 93 decibels on the A scale. However, when these figures are compared with the testing results obtained by plaintiffs' expert witness, it does not follow as a matter of fact that a possible requirement of smaller engines and mufflers would reduce the sound produced by Speedway's operation to a tolerable level. Particularly is this so when it is remembered that 93 A-weighted decibels for a single engine exceeded the sound intensities complained of by plaintiffs and found existing by their expert witness. Also, the noise reduction obtainable by muffler use on a single motor does not take into account the prolonged sound levels produced by the overall operation of the racetrack caused by the noise of several racing units running at the same time, the sound of screeching tires, the track's loud-speaker system, and the general hullabaloo of the racing fans. Moreover, and not to be ignored is that the nuisance alleged and found to exist was not confined

to the single element of sound. The nuisance, in addition to noise, consisted of dust and offensive odors or fumes created by the racing automobiles and the glaring lights from the flood lamps at the speedway which invaded the homes located in the near vicinity of the track. In other words, the mere lessening of the noise as shown as a possibility by Speedway's evidence would not singly serve to abate the nuisance.

Speedway's final two points, consolidated by us for determination, are that the trial court erred in considering and admitting into evidence the re-recorded and edited tape segments prepared by plaintiffs' expert witness of the sounds recorded while races were being run at Speedway's track. The reasons assigned in Speedway's brief are that (a) "no proper foundation was laid for their admission into evidence," (b) they "were not the best evidence available" and (c) "because they had admittedly been edited."

At the trial the only objection to the tape exhibit was "because it does not give the full picture. He just picked out the most severe time. I think he should have given the full race, if he wanted to do that."

 It is well established that a litigant may not interpose one objection to evidence in the trial court and different objections to the evidence on appeal. *Negley B. Calvin, Inc. v. Cornet*, 427 S.W.2d 741, 746[6] (Mo.App.1968). Hence the objections now advanced, that the re-recorded segments were not the best evidence and that a proper foundation for them had not been laid, are not properly before us on appellate review.

Plaintiffs' expert witness testified that by use of a high quality tape recorder, calibrated tape and a sound level meter, he had recorded sounds coming from the racetrack while races were in progress. He had made original recordings at three locations "over approximate 15 minute intervals at each location." The recorded sound, both on the original recording and on the re-recording consisting of "approximately 60 seconds at each of 3 locations," would, according to the witness, accurately produce the same sound levels as those actually heard and tested at the involved locations. The segments on the re-recording were based upon levels which occurred during an active race, and in selecting the 60-second segments the witness used "averages between the minimum and maximum in an effort to be fair about it." Although the witness had the original recording, no party requested that it be produced or played for its 45-minute duration.

 Re-recordings are generally admissible in evidence if, as here, their authenticity is established. Annot., 58 A.L.R.3d 598, § 6, pp. 612–617; 58 A.L.R.2d 1024, § 10[b], p. 1044; 29 Am.Jur.2d, Evidence, § 492, pp. 550–551. As seen by Speedway's trial objection, it did not object to the re-recorded segments because they were not authentic or did not accurately produce the same sounds and volumes heard at the locations in question. Rather, the objection was on the assumption that the re-recorded segments were only of "the most severe time." When this was dissipated by the explanation that the segments were "averages between the minimum and maximum," we can find no error in their admission. If an action is tried without a jury, the trial judge may properly allow wide latitude in the admission of evidence [*Mashak v. Poelker*, 367 S.W.2d 625, 626[2] (Mo. banc 1963)], and we harbor no doubt as to the ability of the experienced trial judge to consider competently the re-recording as an abbreviated version of the whole.

The judgment is affirmed.

All concur.